**UNITED STATES of America,**

v.

**Ruben CEBALLOS, and Policarpo Carbonell, Defendants.**

No. CR–89–0062.

United States District Court, E.D. New York.

June 30, 1989.

---

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. by Steven Abrams, for U.S.

Joseph C. Schioppi, for defendant Ceballos.

Linda S. Povman, Elmhurst, N.Y., for defendant Carbonell.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

This narcotics case presents a nice question as to whether there was a valid basis for stopping and frisking defendants and, if so, whether the agents' reasonable suspicion of criminal activity ripened into probable cause to arrest upon discovery of cocaine during the pat-down of one defendant. It is typical of the trend to attenuate constitutional protections of those believed to be on the wrong side of the accelerating

war on drugs. If we do not soon solve the drug problem that afflicts our land, we can expect further deterioration of all our constitutional rights as part of the price we pay for our failure.

Pursuant to Federal Rule of Criminal Procedure 12(b), defendants Ruben Ceballos and Policarpo Carbonell move to suppress the physical evidence seized and statements made by them at the time of their arrest on January 12, 1989. Based upon the facts developed at an evidentiary hearing, the motion must be denied. We set forth the evidence in some detail since so much of the conclusion depends upon bits and pieces of information and the inferences that could reasonably be drawn from them by experienced government agents.

## I.

### Facts

On January 12, 1989, Special Agents Kenneth Dinino, Mike Torretta, Steven Whipple and Gerry McAleer of the Drug Enforcement Administration (DEA) conducted a surveillance of a bank of public pay phones in a McDonald's parking lot near the Whitestone Expressway and Linden Point Boulevard in Queens County. Between them the agents had many years of experience apprehending dealers in narcotics.

Agents Dinino and Torretta were seated in one vehicle approximately ten feet away from the phones, their vision unobstructed. Agents Whipple and McAleer were in a second vehicle some distance away. All the agents were linked by radio.

Agent Dinino testified that this was a known narcotics trafficking area frequented by dealers who use the pay phones to transact their business. The three other agents had made other arrests in the area.

At approximately 6:30 p.m. a vehicle pulled up alongside the pay phones. Agent Dinino observed the driver, defendant Ceballos—then unknown to the agents—walk up to a phone, pick up the receiver, punch in a series of numbers, wait, and then punch in seven or ten additional numbers and hang up without engaging in any conversation. Within thirty seconds to a minute the phone rang back. Defendant Ceballos picked up the receiver and engaged in conversation.

Based on his training and field experience, Agent Dinino characterized this activity as a "beeper call." From the manner in which defendant Ceballos used the phone, the agent believed that Ceballos was placing a call to, or "beeping," someone's pager and punching in the number of the pay phone so that the recipient could return his call. When Ceballos did not engage in conversation and the phone rang back within a minute, Agent Dinino concluded that Ceballos had made a "beeper call."

Defendant Ceballos returned to his vehicle upon completion of the phone call. Defendant Carbonell, also unknown to the agents, was observed in the passenger seat. Based upon the information that Ceballos had placed a "beeper call," the agents reached a consensus decision over the radio to follow the vehicle. The vehicle proceeded a short distance underneath the Whitestone Expressway overpass to the Adventurer's arcade parking lot and pulled up to another phone booth where Ceballos made two phone calls. As Ceballos was walking back to the car, Carbonell exited and engaged in a brief conversation with Ceballos which the agents could not overhear. Both got back into the car. The agents decided to continue their tracking of the suspects.

The defendants proceeded onto the Whitestone Expressway. Traffic was moderate. Agent Dinino testified that Ceballos drove in an evasive manner, alternately speeding up and slowing down and frequently changing lanes so that at one point his car was forced to drive by the defendants. The second vehicle was able to maintain surveillance. Based on his experience, Agent Dinino characterized this driving as an effort to avoid surveillance. Agent Whipple concurred that Ceballos was driving at a rate faster than the normal traffic and weaving in and out, indicating that the defendants appeared to be "in a hurry to get somewhere."

After approximately fifteen minutes, the defendants exited the expressway and parked their vehicle on 26th Avenue at 42nd Street in Astoria, Queens. They emerged from the car and walked around to the trunk. Ceballos opened the trunk and took out two plastic bags, similar to those distributed by supermarkets. He held one in his hand and handed the other, which was partially folded over, to Carbonell, who placed it inside his jacket. The agents could not see the contents of either bag.

Agent Whipple by this time was walking towards the vehicle from behind. After watching this exchange, he signalled to the other agents to approach. Agent McAleer pulled his vehicle in front of the defendants' car and approached them from the front with his shield out while Agents Dinino, Torretta and Whipple approached from behind. Both Agent McAleer and Agent Dinino identified themselves as officers. No guns were drawn.

Ceballos fled at the agents approach, running past Agent Dinino into the street. Agent Dinino drew his gun and pursued him. After chasing him down a lengthy block, Dinino apprehended Ceballos, frisked him and returned him to the vicinity of his vehicle. The frisk revealed nothing.

Carbonell also attempted to run but was restrained after only a few steps by Agent Whipple. Whipple placed him on the ground and immediately frisked him for weapons. During the pat-down, Agent Whipple felt a large bulge inside the left side of Carbonell's jacket. He retrieved a white plastic bag from Carbonell's inside jacket pocket. The bag, which the agents had seen Ceballos hand to Carbonell earlier, contained "rock" cocaine, approximately a half kilo in weight.

When Agent Dinino learned of the cocaine, he placed Ceballos under arrest. Agent McAleer advised Ceballos of his constitutional rights in Spanish. Agent Dinino conducted a further search of Ceballos' person, which revealed $856 in U.S. currency in his waistband. Upon questioning, Ceballos stated that the money was to pay his rent.

Agent Whipple placed Carbonell in the back seat of Agent McAleer's vehicle and advised him of his *Miranda* rights in Spanish. Whipple testified that Carbonell agreed to talk with them. Carbonell stated that he did not know anything about the cocaine, that he had borrowed the jacket from a friend of his who was now in Columbia, and that he had not known that the cocaine was in the jacket. Based upon their observations just a few minutes before, the agents knew that Carbonell was lying.

## II.

### Law of Stops in Narcotics Context

Defendants Ceballos and Carbonell move to suppress the evidence seized and statements made at the time of their arrest on the ground that the agents lacked the requisite reasonable suspicion of criminal activity to validly stop them for investigative purposes. They argue that the subsequent seizure and arrest were therefore the result not of probable cause but of illegal law enforcement conduct in violation of the fourth amendment.

Efforts to meet what is widely apprehended as a serious menace of narcotics to the country's well-being has led the courts to reduce fourth amendment protections. In recent years the Supreme Court has recognized the public's " 'compelling interest in detecting those who would traffic in deadly drugs for personal profit.' " *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642–43, 77 L.Ed.2d 110 (1983) (quoting Powell, J., concurring in *United States v. Mendenhall,* 446 U.S. 544, 561, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980)). *See also United States v. Vasquez,* 634 F.2d 41, 44 (2d Cir.1980). That interest has contributed to increased law enforcement efforts to detect and curb "the horrors of drug trafficking," *Illinois v. Gates,* 462 U.S. 213, 241, 103 S.Ct. 2317, 2334, 76 L.Ed.2d 527 (1983), which has, in turn, led to an increase in fourth amendment law approving investigatory stops. *See Project: Seventeenth Annual Review of Criminal Procedure,* 76 Geo.L.J. 521,

564 n. 210 (1988). The increase in fourth amendment questions in a drug trafficking context is due in part to the difficulty of detecting narcotics offenses. *See United States v. Place*, 462 U.S. at 704 n. 5, 103 S.Ct. at 2643 n. 5 (" 'the obstacles to detection of illegal [drug traffic] may be unmatched in any other area of law enforcement' ") (quoting Powell, J., concurring in *United States v. Mendenhall*, 446 U.S. at 561–62, 100 S.Ct. at 1880–81); *United States v. Ramirez–Cifuentes*, 682 F.2d 337, 344 (2d Cir.1982) (acknowledging "the elusive nature of trafficking in narcotics"). Complicating the difficulty of detection is the fact that the prosecution of drug offenses "depends heavily on physical evidence." *United States v. Leon*, 468 U.S. 897, 907 n. 6, 104 S.Ct. 3405, 3412 n. 6, 82 L.Ed.2d 677 (1984).

Commentators have voiced concern that the heightened interest in stemming the tide of drug trafficking will erode whatever fourth amendment protection is still afforded by the *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), line. *See* Saltzburg, *Another View of Illegal Narcotics (As Illustrated by the Open Fields Question)*, 48 U.Pitt.L.Rev. 1, 4, 23 (1986) (courts are "turning their backs" on fourth amendment principles "in order to aid the war against illicit drugs"); LaFave, *Fourth Amendment Vagaries (Of Improbable Cause, Imperceptible Plain View, Notorious Privacy, and Balancing Askew)*, 74 J.Crim.L. & Criminology 1171, 1223–24 (1983) ("the maleficent trafficking in drugs" may produce "atrophy of the fourth amendment"). Nevertheless, it is still necessary in each case to assess "the delicate balance which must be struck between the interest of the public in terminating narcotics smuggling [and trafficking] and the individual's right to live unburdenened by unreasonable intrusions on his privacy...." *United States v. Ramirez–Cifuentes*, 682 F.2d 337, 338 (2d Cir.1982).

*Terry* set forth the now familiar standard that an investigatory stop and frisk may be performed when law enforcement officers have a reasonable suspicion that criminal activity "may be afoot." 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968). Suspicion is reasonable when based not upon inchoate hunches but upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the belief that a crime is being or has been committed. *Id.* at 21, 88 S.Ct. at 1879–80; *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). A stop must be "grounded on specific and articulable facts which justified a reasonable suspicion" that the suspect was engaged in a narcotics transaction. *United States v. Ramirez–Cifuentes*, 682 F.2d 337, 344 (2d Cir.1982); *see United States v. Vasquez*, 634 F.2d 41, 43 (2d Cir.1980).

Though the level of suspicion for a *Terry* stop is less demanding than that for probable cause to arrest, *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), like probable cause it is a "fluid concept" turning on an assessment of the grounds for suspicion "in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 233, 103 S.Ct. 2317, 2329–30, 76 L.Ed.2d 527 (1983). To determine the existence of probable cause to arrest, *Gates* established that "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the *degree* of suspicion that attaches to particular types of noncriminal acts." 462 U.S. at 243–44, n. 13, 103 S.Ct. at 2335 n. 13 (emphasis added). In *Sokolow*, the Court recognized that this principle "applies equally well to the reasonable suspicion inquiry." 109 S.Ct. at 1587.

As law enforcement officials' knowledge of the narcotics industry expands and the tools and techniques of the trade shift, the indicia of suspicion and degree of import attached to each will also change. Those indicia must be evaluated "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 419, 101 S.Ct. 690, 696, 66 L.Ed.2d 621 (1981). A pattern of behavior interpreted by the untrained observer as innocent may justify a valid investigatory stop when viewed collectively by experienced drug enforcement agents who are cognizant of current drug

trafficking operations. *See United States v. Vasquez,* 634 F.2d 41, 43 (2d Cir.1980). A virtuoso may draw reasonable inferences and suspicions of criminal involvement that would elude the amateur. *See United States v. Cortez,* 449 U.S. at 419–20, 101 S.Ct. at 695–96. Suspicion will be deemed reasonable if the conduct as a whole would appear suspect to one familiar with the practices of narcotics dealers. *See United States v. Ramirez–Cifuentes,* 682 F.2d 337, 342 (2d Cir.1982).

### III.

### Beepers

With increasing frequency, many people, including doctors, plumbers and lawyers, are using beepers. As Agent Whipple testified, narcotics traffickers are known to utilize pay phones and beepers in order to avoid detection by law enforcement officers. Advances in technology now enable traffickers to communicate times, dates, locations, prices, and quantities for narcotics transactions via codes to other beepers.

■ Courts have recently come to recognize "beeper calls" as one indication that drug trafficking "may be afoot.". *See United States v. Cruz,* 834 F.2d 47, 48 (2d Cir.1987) (agent testified that "calling beepers is a very common practice among narcotics dealers"); *United States v. Ginsberg,* 758 F.2d 823, 829–30 (2d Cir.1985) (detective testified as an expert that narcotics dealers often use beepers to contact members of their organization); *United States v. Hoyos,* 868 F.2d 1131, 1136 (9th Cir.1989) ("beeper calls" one of many incriminating facts giving rise to probable cause). In *Hoyos* the Ninth Circuit recognized that "[n]arcotics dealers in Los Angeles County use beepers and public telephones in plying this illicit trade." *Id.* This court has now heard ample testimony and received in evidence a sufficient number of beepers in many cases to confirm that Eastern District of New York narcotics dealers use much the same beeper techniques as their West Coast colleagues. Of this fact of life in the world of narcotics, we take judicial notice. Fed.R.Evid. 201.

■ Calls to a beeper may often be for a legitimate purpose. When they are made from a pay phone in a known narcotics location, however, they properly attract the interest of anti-narcotics forces. Dinino, an agent with less experience than his companions, testified that he had been informed by his colleagues that the pay phones in the McDonald's parking lot had been frequented by many people making drug transactions. He was entitled to rely on the more senior agents for this information. Knowledge gleaned from others may permissibly enter into the agents' reasonable suspicion determination. *Cf. United States v. Cruz,* 834 F.2d 47, 51 (2d Cir. 1987) ("The determination of whether probable cause to arrest exists can be based on the collective knowledge of all of the officers involved in the surveillance efforts because the various law enforcement officers in this investigation were in communication with each other.").

### IV.

### Other Suspicious Evidence

■ Though the presence of a person in a neighborhood known for its high incidence of narcotics or other crimes does not alone create reasonable suspicion to stop, *see Brown v. Texas,* 443 U.S. 47, 53, 99 S.Ct. 2637, 2641–42, 61 L.Ed.2d 357 (1979), or probable cause to arrest, *see United States v. Green,* 670 F.2d 1148, 1152 (D.C. Cir.1981), the character of the area as a center of crime may enter into the reasonable suspicion calculus of a law enforcement officer. *See, e.g., id.,* (street corner exchange of money for object from a paper bag in neighborhood "notorious" for narcotics trafficking); *United States v. Jenkins,* 530 F.Supp. 8, 10 (D.D.C.1981) (same); *United States v. Espinosa,* 827 F.2d 604 (9th Cir.1987) (transfer of money halted upon sight of police in known drug trafficking area).

The agents here focused upon Ceballos and Carbonell upon seeing Ceballos make "beeper calls" at a pay phone known to be used by narcotics dealers and suppliers practicing their trade in the area. Their

suspicion was sufficiently piqued to warrant further observation of the defendants.

■ Evasive driving is another indicia of suspicion of drug trafficking. *See United States v. Ginsberg,* 758 F.2d 823, 826–27 (2d Cir.1985) (defendant drove away evasively, circling area and alternately speeding up and slowing down); *United States v. Vasquez,* 634 F.2d 41, 43 (2d Cir.1980) (defendants "attempt[ed] to confuse the tailing agents in traffic"); *United States v. Hoyos,* 868 F.2d 1131, 1136 (9th Cir.1989) ("Hoyos was observed driving in a manner that is typical of counter-surveillance techniques used by persons involved in large scale narcotics transcations."); *United States v. Chatman,* 573 F.2d 565, 566 (9th Cir.1978) ("The manner in which the car was driven indicated a desire to avoid surveillance.").

The defendants proceeded from the McDonald's parking lot to another public telephone at the Adventurer's arcade lot just on the other side of the Whitestone Expressway. Ceballos made several "regular" phone calls and consulted with Carbonell outside their vehicle. They then proceeded to the Whitestone Expressway where they engaged in what appeared to the agents to be counter-surveillance driving: weaving in and out of traffic, speeding up and slowing down, and driving at a rate faster than the normal traffic as if they had to get somewhere in a hurry.

■ Defendants protest the characterization of their driving as counter-surveillance, distinguishing *Hoyos* and *Chatman* where the driving involved multiple U-turns, accelerating through intersections at yellow lights, and squaring blocks. Evasive driving on a highway will naturally involve different maneuvers from those possible on city streets. Agent Dinino's characterization of defendants' driving as an attempt to avoid surveillance is credible based on the agent's surveillance experience and training.

■ "[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea.*" *Sibron v. New York,* 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1967). Though flight alone is too ambiguous to be "a reliable indicator of guilt"—an innocent person may sometimes flee from fear of mistaken apprehension—"'when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime,'" it may enter into the probable cause assessment. *Hinton v. United States,* 424 F.2d 876, 879 (D.C.Cir.1969) (quoting *Sibron v. New York,* 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1967). *See also United States v. Hoyos,* 868 F.2d 1131, 1136 (9th Cir.1989); *United States v. Green,* 670 F.2d 1148, 1152 (D.C. Cir.1981). If flight may properly be considered in the probable cause for arrest evaluation, then it may also enter the reasonable suspicion determination.

When the defendants reached their destination at 26th Avenue in Astoria, the agents' hunches properly matured into heightened suspicion. The defendants exited their vehicle and opened the trunk. Ceballos then handed a partially folded white plastic bag to Carbonell who placed it inside his jacket. Believing they had just witnessed a narcotics transaction, the agents decided to approach. When they identified themselves as police officers, Ceballos fled and Carbonell attempted to flee.

■ The defendants' flight in this case was the crest of a rising wave of suspicion. It justified the agents' decision to chase defendants and detain them for questioning.

■ Though no one of the factors contributing to the agents' suspicion—the "beeper calls," evasive driving, suspicious transaction and flight—was sufficient by itself to establish the requisite reasonable suspicion necessary to support an intrusion upon the defendants' personal security, it is the totality of these circumstances as appraised by such experienced drug enforcement agents that determines the reasonableness of their suspicion and justification for a stop and protective intrusion on their person by a pat-down. *See United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989); *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690,

694–95, 66 L.Ed.2d 621 (1981). Taking the whole picture into account, the experienced agents drew inferences sufficiently well-founded and based upon their observation of defendants' behavior to warrant their reasonable suspicion that defendants were engaging in an illegal narcotics transaction.

## V.

### Frisk

*Terry v. Ohio* established the power of law enforcement officers to perform a self-protective search for weapons when the officer reasonably fears for his safety or the safety of others because the suspect may be armed and dangerous. 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). Because of the increasingly violent nature of narcotics trafficking, including the recent killings of law enforcement officers by drug trafficking suspects within the Eastern District of New York, the need to frisk those suspected of committing a narcotics offense in the course of a street encounter is obvious. *See United States v. Vasquez*, 634 F.2d 41, 43 (2d Cir.1980) (detectives justified in making a protective frisk, "particularly in view of the violent nature of narcotics crime"); *United States v. Oates*, 560 F.2d 45, 62 (2d Cir.1977) (firearms are the "tools of the trade" of narcotics dealers); *United States v. Trullo*, 809 F.2d 108, 113 (1st Cir.) (frisk for weapons may accompany seizure of drug trafficking suspect), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987).

In *Terry* Justice Harlan recognized the necessity of an immediate frisk when a crime of violence is the object of suspicion:

Where such a stop is reasonable, ... the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence. Just as a full search incident to a lawful arrest requires no additional justification, a limited frisk incident to a lawful stop must often be rapid and routine. There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet.

*Terry*, 392 U.S. at 33, 88 S.Ct. at 1886. (Harlan, J., concurring). Though Justice Harlan was not certain in 1968 that suspected possession of narcotics fell into the category of a crime "whose nature creates a substantial likelihood that [the suspected offender] is armed," *Sibron v. New York*, 392 U.S. 40, 74, 88 S.Ct. 1889, 1907, 20 L.Ed.2d 917 (1968) (Harlan, J., concurring), the nature of narcotics trafficking today reasonably warrants the conclusion that a suspected dealer may be armed and dangerous.

The automatic utilization of frisks in narcotics investigations invites the possibility of abuse. "Permitting stops for narcotics offenses presents the most obvious temptation to abuse the frisk as an occassion for searching for contraband." *Model Code of Pre-Arraignment Procedure* 278 (1975). Frisking for weapons may not be a pretext for a general search of the person. "It is axiomatic that an incident search may not precede an arrest and serve as part of its justification." *Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968) (officer impermissibly thrust hand into Sibron's pocket seeking narcotics). Probable cause to arrest may not be "bootstrapped into existence by evidence discovered in a search exceeding the bounds permitted by *Terry*." *United States v. Chatman*, 573 F.2d 565, 569 (9th Cir.1977) (Takasugi, J., dissenting).

█ Here, the agents' reasonable suspicion that they had witnessed a narcotics transaction established the requisite premise for conducting a self-protective frisk for weapons.

New facts may emerge in the course of a *Terry* stop. The frisk may reveal information that will suffice to create probable cause for arrest and search. The Court anticipated this when it declared: "If the 'stop' and the 'frisk' give rise to probable cause to believe that the suspect has committed a crime, then the police should be empowered to make a formal 'arrest,' and a full incident 'search' of the person." 392 U.S. at 10, 88 S.Ct. at 1874. Probable

cause exists where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949).

## VI.

### Tactile Discovery of Contraband

The discovery of contraband frequently is the result of a frisk. If "by touch" an officer is uncertain as to whether an article felt during a pat-down may be a weapon, he is "entitled to remove it." *United States v. Oates*, 560 F.2d 45, 62 (2d Cir. 1977) (removal of wallet permissible when officer could not determine what caused bulge by feeling it through defendant's outer clothing). In *Sibron*, the officer felt an object in Peters' pocket that might have been used as a weapon but seizure revealed it to be a kit of burglar's tools—an instrument of the crime suspected. Justice Harlan, concurring in *Sibron*, summarily asserted that if the frisk is lawful, "the State is of course entitled to the use of any other contraband that appears." 392 U.S. at 79, 88 S.Ct. at 1910. (The majority never reached this question because it held that probable cause to arrest Peters existed before the pat-down occurred.)

In *Michigan v. Long*, extending *Terry* to the protective search of a vehicle, the Court declared that if "the officer should, as here, discover contraband other than weapons, he clearly cannot ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances." 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983) (search of object protruding from under armrest revealed open pouch of marijuana). Courts so routinely admit evidence other than weapons accidentally discovered in the course of a frisk that they rarely explain the justification for its admission. *See, e.g., United States v. Bechdel*, No. 87–CR–618, slip. op., 1988 WL 2501 (E.D.N.Y. January 8, 1988).

Agent Whipple's testimony raises the question whether an object discovered in a pat-down that does not feel like a weapon, but appears fairly clearly to be narcotics, may be removed for visual inspection. Whipple testified that while he was frisking Carbonell for weapons, he "felt the large package in this front left pocket" which he "believed .. to be narcotics." The package was a solid mass, about five inches by four inches by one inch. He knew from touching it that it was not a gun or some other weapon. Rather, the frisk confirmed his earlier suspicions that the plastic bag he had seen exchanged contained narcotics.

Mere observation of suspicious "bulges" in connection with other suspicious circumstances has provided the basis for probable cause to arrest in other narcotics cases. *See United States v. Torres*, 740 F.2d 122, 128 (2d Cir.1984) (observation of bulge in Torres' jacket and subsequent discovery of cocaine during investigatory search was sufficient to raise suspicion to probable cause that he was a member of cocaine ring); *United States v. Palen*, 793 F.2d 853, 858 (7th Cir.1986) (upon noticing a bulge two to three inches in width, three inches wide and four to five inches in height, agent "had probable cause to believe the bulge contained illicit drugs and therefore had probable cause to make a search of defendant's person and, ultimately, an arrest"); *United States v. Elsoffer*, 671 F.2d 1294, 1298–99 (11th Cir.1982) (unusual size and shape of bulge in defendant's trousers provided probable cause to arrest and incident search); *United States v. Ilazi*, 730 F.2d 1120, 1127 (8th Cir.1984) (probable cause to arrest defendant existed when he refused to explain the bulge on the inside of his boot).

█ A fortiori, evidence revealed by touch in the course of a frisk is admissible, under what the Second Circuit has characterized as the "plain feel" version of the "plain view" doctrine, if the "feel" was proper. *United States v. Ocampo*, 650 F.2d 421, 429 (2d Cir.1981) (contents of a container "easily discernible by frisking the exterior of a package"); *see also United*

*States v. Portillo,* 633 F.2d 1313,1320 (9th Cir.1980) (contents "apparent from the outward feel of container.") If the frisk is lawful, then the discovery of the evidence will be deemed "inadvertent" should the incriminating nature of the evidence felt be "immediately apparent"; the officer then has probable cause to believe that the item to be seized is evidence of the crime suspected, and the seizure is permissible. *Cf. Arizona v. Hicks,* 480 U.S. 321, 326–28, 107 S.Ct. 1149, 1153–54, 94 L.Ed.2d 347 (1987) (setting forth conditions of plain view exception); *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983) (same); *Washington v. Chrisman,* 455 U.S. 1, 5–6, 102 S.Ct. 812, 815–17, 70 L.Ed.2d 778 (1982) (same); *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971) (same); *United States v. Barrios–Moreira,* 872 F.2d 12, 16–17 (2d Cir.1989) (plain view inadvertence requirement prevents unlawful exploration).

■ The tactile discovery during the pat-down revealed evidence of the crime suspected and transformed the agent's reasonable suspicion into probable cause to arrest. The feel of the object, together with the pattern of defendants' behavior observed earlier, amounted to probable cause to believe the object was narcotics and that the defendants had committed a narcotics offense. The circumstances preceding Agent Whipple's frisk of defendant Carbonnel—the "beeper calls," evasive driving, suspicious transaction and attempted flight—provided the foundation necessary for the natural ripening of suspicion into probable cause upon the incidental tactile discovery of cocaine during the pat-down for weapons. Any of the five senses, alone or in combination, may provide reliable evidence.

■ Removal of the package from Carbonell's jacket merely confirmed what the agent's sense of touch had already revealed. The seizure of cocaine was permissible as incident to a lawful arrest.

## VII.

### Conclusion

The defendants' motion to suppress the half kilogram of cocaine seized upon their arrest is denied. It was seized incident to a lawful arrest following a valid investigatory stop and frisk. The motion to suppress statements taken from the defendants is also denied because they were made after defendants were fully advised of their *Miranda* rights upon their lawful arrest.

So ordered.