KELLY, Judge,
concurring.
I concur only in the result reached by the majority. The majority concludes “We can not lose sight of the fact that this began as a Terry frisk. Once the officer was satisfied that Marconi was not armed and dangerous, the inquiry should have ended.” Majority Opinion at 18. To the extent that the majority finds that the instant circumstances presented sufficient justification for the officer to stop and conduct only a protective frisk, I agree.[1] To the extent, however, the majority holds that there can be no circumstances which would justify a police officer to conduct a further, more intrusive search based on tactile impressions, I must disagree.
It is axiomatic that the Fourth Amendment protects citizens from the government’s unreasonable searches and seizures. Where, of course, the government lacks a search warrant, it is well settled that searches of the person are *618 considered reasonable if the officer had probable cause to believe the suspect was possessing contraband or was otherwise guilty of a crime. United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Commonwealth v. Canning, 402 Pa.Super. 438, 587 A.2d 330 (1991); Commonwealth v. Williams, 390 Pa.Super. 493, 568 A.2d 1281 (1990); Commonwealth v. Elliott, 376 Pa.Super. 536, 546 A.2d 654 (1988) , appeal denied, 521 Pa. 617, 621, 557 A.2d 721, 724 (1989) .
In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court considered the question of whether, in view of American criminals’ “long tradition of armed violence,” and the fact that “every year law enforcement officers are killed in the line of duty, and thousands more are wounded,” Terry, supra, 392 U.S. at 23, 88 S.Ct. at 1881, 20 L.Ed.2d at 907, it is reasonable for an officer to conduct a protective search without probable cause. After balancing the citizen’s interest in being free from unreasonable governmental intrusions against the officers’ need for safety, the Court held that it is reasonable under the Fourth Amendment for the police officer to conduct a brief investigatory stop and weapons frisk where the officer has reasonable suspicion to believe that 1) criminal activity is afoot and 2) the person with whom he is dealing may be armed and dangerous. Terry, 392 U.S. at 31, 32, 88 S.Ct. at 1885, 20 L.Ed.2d at 911.
The majority concludes that a search following a protective frisk cannot be justified by the holding in Terry. Majority Opinion at 621. With this I agree. What the majority does not, in my opinion, make clear, is that the question involved instantly falls beyond the ambit of Terry’s holding. Once it is established that the officer stopped and frisked the suspect only after he or she had reasonable suspicion that criminal activity was afoot and that the suspect was armed and dangerous, the requirements of *619 Terry are satisfied.[2] Whether or not an additional, more intrusive post-protective frisk search can be justified depends upon an entirely distinct inquiry: whether “further information came to light during the detention or the frisk to justify an arrest, which could have properly included a complete warrantless search.” Commonwealth v. Carter, 334 Pa.Super. 369, 374, 483 A.2d 495, 497 (1984). This determination involves simply a question of whether there was sufficient evidence to establish that the officer had probable cause to arrest a suspect and search him or her *620 incident to the arrest. See United. States v. Robinson, supra; Adams v. Williams, supra; Commonwealth v. Elliot, 376 Pa.Super. 536, 551, 546 A.2d 654, 661 (1988); Commonwealth v. Canning, supra, 402 Pa.Super. at 441, 587 A.2d at 332 (“[Bjecause there was probable cause to arrest, the officer was justified in searching appellant incident to that arrest and the evidence was properly admissible.”). Neither Terry nor its progeny address this evidentiary concern.[3]
It is well established that visual evidence derived during an investigatory stop and frisk is considered relevant in making the probable cause determination. “The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with some criminal activity.” Illinois v. Andreas, 463 U.S. 765, 711, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003, 1010 (1983); see also Horton v. California, 495 U.S.-, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); Commonwealth v. Carelli, 377 Pa.Super. 117, 132-133, 546 A.2d 1185, 1192-93 (1988); Commonwealth v. Ferrari, 376 Pa.Super. 307, 326-327, 545 A.2d 1372, 1381-82 (1988). It has been applied in the context of protective weapons frisks to justify the seizure of evidence discovered when suspicious items were thought to be weapons, but discovered to be mere evidence of a crime when removed from a suspect’s pocket. See Peters v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (consolidated on appeal with Sibron v. New York, *621 supra) (burglar’s tools); Commonwealth v. Dial, 445 Pa. 251, 285 A.2d 125 (1971) (pill case and syringe); Commonwealth v. Elliot, 376 Pa.Super. 536, 546 A.2d 654 (1988) (stash kit). The plain view doctrine has also been applied to justify seizure of contraband discovered during a protective search of the passenger compartment of a suspect’s car. See Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).
In Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), a plurality of the Supreme Court opined:
“Plain view” is perhaps better understood ... not as an independent “exception” to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer’s “access to an object” may be.
The principle is grounded on the recognition that when a police officer has observed an object in “plain view,” the owner’s remaining interests in the object are merely those of possession and ownership. Likewise, it reflects the fact that requiring police to obtain a warrant once they have obtained a first-hand perception of contraband, stolen property, or incriminating evidence generally would be a “needless inconvenience” that might involve danger to the police and public. We have said previously that “the permissibility of a particular law enforcement practice is judged by balancing its intrusion on ... Fourth Amendment interests against its promotion of legitimate governmental interests.” In light of the private and governmental interests just outlined, our decisions have come to reflect the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately.
Id., 460 U.S. at 738-39, 103 S.Ct. at 1541-42, 75 L.Ed.2d at 511-12 (emphasis added) (citations omitted). The Court further explained that the terms “probable cause” and “immediately apparent” as used in plain view situations could not be interpreted as “establishing any requirement that a police officer ‘know’ that certain items are contra *622 band or evidence of a crime.” Id. 460 U.S. at 741, 103 S.Ct. at 1543, 75 L.Ed.2d at 513.
The Commonwealth argues that the tactile evidence derived through a frisk should be considered relevant in determining probable cause as well. I can find no reason to disagree.
The existence of both probable cause and reasonable suspicion are determined by considering all the facts and reasonably derivable inferences known to the officer at the time of the challenged act. See Commonwealth v. Gray, 509 Pa. 476, 503 A.2d 921 (1985) (adopting “totality of circumstances” test).[4] We do not apprehend facts or derive *623 inferences with our eyes, ears, nose, fingers, or tongue, nor by the senses connected with those parts of the body. Rather, as it has been previously explained, those parts and the senses connected with them merely serve as the conduits by which information is sent to the brain for processing:
... the sense organs provide us with a picture of the physical world. Our problem is to interpret the sensory information and extract its psychological content. To do this we need to process the incoming signals and interpret them on the basis of our past experiences. Memory plays an active role in this process. It provides the information about the past necessary for proper understanding of the present. There must be temporary storage facilities to maintain the incoming information while it is being interpreted, and it must be possible to add information about presently occurring events into permanent memory. We then make decisions and take actions on the information we have received.
Norman, Memory and Attention, at 3 (2d Ed.1796) (emphasis added).
Probable cause and reasonable suspicion are degrees of belief which express an assessment of the probability that a particular conclusion, drawn from the analysis of present sensory impressions and stored experiences, is correct. If the true concern is whether probable cause exists at the time of the challenged act, the type of the last sensory impression (i.e. visual, gustatory, olfactory, aural, or tactile) necessary to tip the balance and establish the requisite degree of belief, should not have constitutional significance.
Certainly, tactile impressions standing by themselves may often be wholly inadequate to support the requisite degree *624 of belief. The truth of this statement, however, in no way warrants a finding that such information is wholly irrelevant, as the tactile impression need not establish probable cause standing alone.[5]
Context, various contemporaneous sensory impressions, and the officer’s memory and experience each may alter the probabilities significantly. See e.g. Texas v. Brown, supra (Powell, J., concurring) (officer may rely on training to make inferences and deductions); Commonwealth v. Stainbrook, 324 Pa.Super. 410, 471 A.2d 1223 (1984) (visual and olfactory impression combined with experience and training to establish probable cause); Commonwealth v. Trenge, 305 Pa.Super. 386, 451 A.2d 701 (1982) (same); Commonwealth v. Pullano, 295 Pa.Super. 68, 440 A.2d 1226 (1982) (olfactory and aural impressions combined with experience to establish probable cause); Commonwealth v. Veal, 287 Pa.Super. 113, 429 A.2d 1125 (1981) (context, visual impressions and experience combined to establish probable cause); Commonwealth v. Stoner, 236 Pa.Super. 161, 344 A.2d 633 (1975) (visual and olfactory impressions combined with experience to establish probable cause).
I find the reasoning utilized in two recent decisions particularly persuasive on this point. In United States v. Ceballos, 719 F.Supp. 119 (E.D.N.Y.1989), two well-experienced undercover Drug Enforcement' Administration (DEA) agents conducted a surveillance over a New York City parking lot, specifically observing the customers using certain public pay phones. Id. at 121. The area was known to *625 be frequented by narcotics dealers who often used the pay phones “to transact their business.” Id. Ceballos was observed dialing a telephone number, punching in an additional seven to ten digits, and hanging up without talking into the receiver. Id. Within less than one minute, he picked up the telephone which had begun to ring. Id. The DEA agents immediately recognized the procedure as the making of a “beeper call.” Id. Ceballos then re-entered his car and, along with a co-defendant, drove a short distance only to stop and place two more telephone calls from another public pay phone. Id. Ceballos and his co-defendant then returned to the car and drove evasively and hurriedly. Id. All the while, the undercover agents successfully maintained surveillance. Id. Next, Ceballos and his co-defendant pulled over at a street corner, where Ceballos exited the car, opened the trunk, and removed two plastic grocery bags. Id. He gave one to the co-defendant, who “placed it inside his jacket.” Id. The officers then made their move and confronted the suspects. Id. The co-defendant’s attempt to flee was thwarted as a DEA agent was able to apprehend him and frisk him for weapons. Id. During the pat-down, one of the agents felt “a large bulge” inside the left side of the co-defendant’s inside jacket pocket, which he knew from touching was not a gun or other weapon but rather which he “believed ... to be narcotics.” Id. at 127.
After noting that the officer had reasonable suspicion to believe that the defendants were involved in drug dealing and that narcotics trafficking today reasonably warrants the conclusion that a suspected drug dealer may be armed and dangerous, the Ceballos Court held that the evidence derived in the post-frisk search was admissible:
The tactile discovery during the pat-down revealed evidence of the crime suspected and transformed the agent’s reasonable suspicion into probable cause to arrest. The feel of the object, together with the pattern of defendants’ behavior observed earlier, amounted to probable cause to believe the object was narcotics and that the defendants had committed a narcotics offense. The cir *626 cumstances preceding Agent Whipple’s frisk of [co-defendant] — the “beeper calls,” evasive driving, suspicious transaction and attempted flight — provided the foundation necessary for the natural ripening of suspicion into probable cause upon the incidental tactile discovery of cocaine during the pat-down for weapons. Any of the five senses, alone or in combination, may provide reliable evidence.
Id. at 128 (emphasis added).
Similarly, in United States v. Pace, 709 F.Supp. 948 (C.D.Cal.1989) aff'd 893 F.2d 1103 (9th Cir.1990), law enforcement agents (a Drug Enforcement Administration agent and a police officer) observed Pace, a suspected drug courier, walk furtively about the Los Angeles International Airport. Id. at 950. The agents approached Pace, identified themselves, and obtained his permission to search his bag and to pat-down his outer garments. Id. at 951. Although the search of the bag did not disclose narcotics or large sums of money, the pat-down did reveal that Pace was in fact a drug courier, for during the pat-down, the officer “felt two hard objects on [defendant’s back. [The police officer] immediately identified these objects through the defendant’s clothing as having the size and shape of two kilos of cocaine packaged in the form of ‘bricks.’ ” Id. Thereafter, the evidence was seized and defendant arrested. Id.
Pace moved for suppression of the two kilograms of cocaine. Id. at 950. After concluding that the frisk of the outer garments was justified through consent, the court reasoned that “[wjhen objects have a distinctive and consistent feel and shape that an officer has been trained to detect and has previous experience in detecting, then touching these objects provides the officer with the same recognition his sight would have produced. ” Id. at 955 (emphasis added). The court found credible the police officer’s testimony that the true identity of the bricks was immediately identifiable by the well-trained police officer *627 who knew well the size, shape and hardness of cocaine packaged in brick form. Id.[6]
Of course, neither of these decisions are binding on this Court. Nor are the decisions of the several other jurisdictions which have already recognized that the touch of certain objects can be a relevant factor in determining probable cause. See United States v. Williams, 822 F.2d 1174 (D.C.Cir.1987) (collecting federal cases); State v. Richardson, 156 Wis.2d 128, 456 N.W.2d 830 (1990); Henderson v. State, 535 So.2d 659 (Fla.App.1988); People v. Lee, 194 Cal.App.3d 975, 240 Cal.Rptr. 32 (1987); State v. Washington, 134 Wis.2d 108, 396 N.W.2d 156 (1986); State v. Ortiz, 67 Haw. 181, 683 P.2d 822 (1984).[7] I would find, however, *628 the rationale employed in each is compelling and applicable in this jurisdiction.[8]
It is important to reaffirm that acceptance of the relevance of such tactile information in this context would not alter the suspect’s protections against unreasonable searches and seizures. In each case, before the Commonwealth could justify the post-frisk search, the Commonwealth would still have the burden of establishing that the officer reasonably believed criminal activity was afoot and that the suspect frisked was armed and dangerous, and that the officer conducted a reasonable protective weapons frisk, during which tactile sensory impressions were received which, combined with other factors, provided probable cause to believe that contraband or evidence of a crime might be found on the suspect’s person. The trial court would have the responsibility to make its own independent assessment of credibility and probability and would be free to reject claims that the frisk was warranted; that the frisk was reasonable in intensity and duration; that particular tactile sensations were obtained; and that the impressions combined with other facts gave rise to the required probable cause to believe that the item was contraband or evidence of a crime. Danger of police abuse would be greatly minimized by conscientious execution of the responsibility of the suppression judge to exercise independent *629 judgment in this respect, as the suppression court did instantly.
Moreover, recognition of the relevance of tactile impressions in determining probable cause would necessarily be no more and perhaps less susceptible to abuse by police disposed to make false claims, than are claims of visual, aural, or olfactory impressions. See United States v. Pace, supra, 709 F.Supp. at 956. An officer’s claim to have seen the butt of a gun underneath a driver’s seat,[9] to have smelled an odor of opium,[10] marijuana,[11] or alcohol,[12] or to have heard a suspect make a particular relevant statement [13] is necessarily personal, subjective and evanescent. Reviewing such claims, the suppression court is often effectively limited to an assessment of the officer’s credibility. On the other hand, since tactile impressions involve physical objects which may be examined by and events that may be re-enacted before the suppression court, see United States v. Pace, supra, 709 F.Supp. at 956, they are readily subject to objective appraisal. Whatever the (in some cases) dubious reliability of the officer’s claimed tactile impressions, the suppression court’s unusually useful opportunity to scrutinize the officer’s account precludes unfettered abuse of such testimony.
Succinctly, I cannot see how, in determining probable cause, the eyes can logically or reasonably say to the hands, “I have no need of thee.” I would hold that, in such determinations, where the trial court credits the testimony of the officer as to the knowledge he or she derived from the touch of an object during a frisk, that knowledge, like *630 that derived from all other sensory impressions, must be given due consideration. Where probable cause is found to exist, a further, more intrusive frisk of the suspect’s person is, of course, constitutionally reasonable.
Applying this rationale instantly, and granting due deference to the suppression court’s determination, I am compelled to conclude that the officer lacked probable cause to search appellee after the investigatory stop and frisk. The officer testified that his frisk disclosed the tactile impression of an object which felt like a “rock or pebble.” Although the officer testified that he believed this object to be drugs, the surrounding circumstances offered insufficient reason to believe that the object was contraband, or for that matter, that it was not simply just what it felt like: a “rock or pebble.” Had the officer credibly testified that the crime he suspected appellee to have committed been a recent burglary of a nearby jewelry store, and had other surrounding circumstances lead the officer to believe that jewelry might have been carried out in the pockets of the culprit(s), the officer’s testimony that he felt a “rock or pebble” in the pocket of appellee during a frisk might have warranted a finding of probable cause. See State v. Washington, 134 Wis.2d 108, 396 N.W.2d 156 (1986) (tactile impression of watches in pocket of suspect near recent burglary of jewelry store sufficient for probable cause). Since no such facts were established, I agree with the majority that the suppression court did not err herein. Hence, I concur.

. The trial court found as a matter of fact that the officer who conducted the instant frisk of appellee first "observed a 1982 Cadillac automobile pull into the parking lot,” Trial Court Opinion at 1; see also N.T. July 11, 1990 at 8, and then “observed the driver of the subject vehicle [appellee] exit from the driver’s side of the vehicle and begin to vomit.” Trial Court Opinion at 2; see also N.T. July 11, 1990 at 10. The trial court found that the officer, suspecting that appellee might have been drinking and driving, approached, and when close enough to the car, recognized appellee, and “knew that the [appellee] had been charged previously with drugs and weapons offenses." Trial Court Opinion at 3; N.T. July 11, 1990 at 16-17. Review of the notes of testimony of the suppression hearing reveals that the officer also testified that upon recognizing appellee, he recalled that appellee had been involved in domestic violence, and that appellee had previously stored a case of grenades at his home. N.T. July 11, 1990 at 16, 17. The officer also testified that immediately before the frisk was conducted he observed appellee lean forward in his seat and reach into his back pocket. Id. at 15. Such facts unquestionably support the conclusion that the officer had a reasonable suspicion that appellee had committed a crime (e.g., driving while under the influence, 75 Pa.C.S.A. § 3731 (1991)), and that he was armed and dangerous.

. I disagree with the majority’s conclusion that it would be “inconsistent with the purpose underlying Terry," Majority Opinion at 615, n. 16, to recognize the relevance of non-weapon tactile evidence gained during a Terry frisk. The Terry Court concluded that “The sole justification of the search in the present situation [stop and frisk] is the protection of the police officer and others nearby____” Id., 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 911. By excluding any evidence obtained where the police stopped and frisked without a reasonable fear the suspect was involved in criminal activity and possessing weapons, this purpose is served. Id.; see also Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Where, however, the officer frisks in accordance with Terry dictates and uncovers evidence of contraband other than weapons, no purpose announced in Terry is forwarded by excluding it at trial. See Michigan v. Long, 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201, 1220 (1983) (Where the officer “discover[s] contraband other than weapons, he clearly cannot ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances.”); Sibron v. New York, 392 U.S. 40, 79, 88 S.Ct. 1889, 1910, 20 L.Ed.2d 917, 944 (1967) (Harlan, J., concurring) (If the frisk is lawful, “[t]he state is of course entitled to the use of any other contraband that appears.”). If the opposite were true, then no non-weapon evidence which was discovered in plain view during an investigatory stop and protective search for weapons could be used at trial either. This we know to be false. See Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (during protective sweep of house, evidence in plain view was properly seized); Michigan v. Long, supra (seizure of evidence during protective sweep of car was reasonable); Commonwealth v. Henry, 358 Pa.Super. 306, 310, 517 A.2d 559, 561 (1986) (seizure of contraband, discovered by opening metal box as part of a self-protective Terry frisk, upheld as proper); Commonwealth v. Chamberlain, 332 Pa.Super. 108, 115-117, 480 A.2d 1209, 1213-14 (1984) (manilla envelopes, which are commonly used for drug packaging, were properly seized when they were observed in "plain view” during course of a protective Terry search); Commonwealth v. Nastari, 232 Pa.Super. 405, 411-412, 335 A.2d 468, 471-472 (1986) (bags appearing in “plain view” when police officer shined a flash light into defendant’s vehicle as a protective measure were properly seized).

. In Commonwealth v. Canning, supra, the question before the Court was not whether, based on information derived during the frisk, the officer could further search the suspect; rather, the question before the Canning Court was whether the officer was justified in frisking the subject in the first place, since the officer "did not articulate any specific facts to justify a belief that appellant might be armed and dangerous.” Canning, supra, 402 Pa.Superior Ct. at 441, 587 A.2d at 331. To the extent the Canning Court’s decision may be seen to construe Terry to preclude the use of non-weapon evidence obtained in a search following a lawful stop and frisk, it must be considered obiter dicta.

. In Texas v. Brown, supra, the Court clarified:
As the Court frequently has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would ‘warrant a man of reasonable caution in the belief,’ Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A “practical, nontechnical” probability that incriminating evidence is involved is all that is required. Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Moreover, our observation in United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), regarding "particularized suspicion,” is equally applicable to the probable-cause requirement:
The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same — and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
Texas v. Brown, supra, 460 U.S. at 742, 103 S.Ct. at 1543, 75 L.Ed.2d at 514.
Justice Powell, with whom Justice Blackmun joined, concurred in the plurality decision in Brown. He wrote separately to note:
If probable cause must be shown, as the Payton dicta suggest, see Payton v. New York, 445 U.S. 573, 587, 100 S.Ct. 1371, [1380], 63 L.Ed.2d 639 (1980), I think it is clear that it existed here. Officer Maples testified that he previously had made an arrest in a case where narcotics were carried in tied-off balloons similar to the one at issue here. Other officers had told him of such cases. Even if it were not generally known that a balloon is a common container for carrying illegal narcotics, we have recognized that a law enforcement officer may rely on his training and experience to draw *623 inferences and make deductions that might well elude an untrained person. United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690 [695], 66 L.Ed.2d 621 (1981). We are not advised of any innocent item that is commonly carried in uninflated, tied-off balloons such as the one Officer Maples seized.
Brown v. Texas, supra, 460 U.S. at 746, 103 S.Ct. at 1545-46, 75 L.Ed.2d at 517.

. As one commentator has stated,
Assuming the object discovered in the pat-down does not feel like a weapon, this only means that a further search may not be justified under a Terry analysis. There remains the possibility that the feel of the object, together with other suspicious circumstances, will amount to probable cause that the object is contraband or some other items subject to seizure, in which case there may be a further search based upon that probable cause.
3 W. LaFave, Search and Seizure, sec. 9.4(c) at 524 (2d ed. 1987); see also I Works of James Wilson, 488-89 (1967) ("[t]he evidence of one sense may be corroborated, in some instances; and in some instance may be corrected, by that of another sense, when both senses convey information concerning the same object,----”).

. As the court in Ceballos, supra, recognized, “A virtuoso may draw reasonable inferences and suspicion of criminal involvement that would elude an amateur.” Ceballos, supra, 719 F.Supp. at 124.

. I note that this Court has, in a different context, previously recognized analagous reasoning with regard to the sensory impressions necessary to give rise to an immediate sensory awareness of a tragic incident in determining whether a cognizable cause of action for negligent infliction of emotional distress has been pled. In Neff v. Lasso, 382 Pa.Super. 487, 555 A.2d 1304 (1989), this Court held:
Our analysis of the foregoing persuasive authorities convinces us that the "sensory and contemporaneous observance” requirement should not be limited to visual observance. Well reasoned opinions in this and other jurisdictions persuade us that the logical and practical focus of the second prong of the Dillon test should be whether the observance was direct and immediate as opposed to indirect and removed and not upon the particular sensory vehicle which gave rise to the awareness of the event and its personal import. It is the immediate sensory awareness and not the source (f.e. visual, tactile, aural, gustatory or olfactory), of the awareness which must control.
******
It may be true that unlike visual observance, aural awareness may rarely, standing alone, give rise to a sufficient awareness of the nature and import of the event to cause severe emotional injury. However, aural perception (hearing the impact) when considered together with prior and subsequent visual observance (seeing Mr. Lasso’s car speeding behind her husband’s pickup and seeing her husband lying unconscious immediately after the impact), may produce a full, direct, and immediate awareness of the nature and import of the negligent conduct____
******
Therefore, we conclude that “sensory and contemporaneous observance” is not limited to visual sensory perception but properly *628 includes an aural sensory awareness as well. Succinctly, it is not the source of the awareness, rather, it is the degree of the awareness arising from all of the individual’s senses and memory which must be determinative of whether the plaintiffs emotional shock resulted from a "sensory and contemporaneous observance" of the accident.
Id. 382 Pa.Super. at 505-06, 555 A.2d at 1313 (emphasis added).

. Although these cases deal only with the Fourth Amendment, exhaustive research has uncovered no relevant and material difference between the Fourth Amendment to the United States Constitution and Article I, section 8 of the Pennsylvania Constitution that would, in this context, lead me to conclude that the rationale used in each of these cases is in any way materially different from an application of Article I, section 8 to such facts. Compare Commonwealth v. Edmunds, 526 Pa. 374, 586 A.2d 887 (1991). Moreover, I note that neither party argues that a distinction between the constitutions in this context exists.

. See, e.g., New York v. Class, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986).

. See, e.g., Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

. See, e.g., United States v. Johns, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985).

. See, e.g., Pennsylvania v. Muniz, — U.S.-, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990).

. See, e.g., Cupp v. Murphy, 412 U.S. 291, 296, 93 S.Ct. 2000, 2004, 36 L.Ed.2d 900, 906 (1973).