408 Pa. Superior Ct. 601 (1991)
597 A.2d 616
COMMONWEALTH of Pennsylvania, Appellant,
v.
Robert MARCONI, Appellee.
Superior Court of Pennsylvania.
Argued April 24, 1991.
Filed August 23, 1991.
Reargument Denied October 16, 1991.
*603 Ann Osborne, Asst. Dist. Atty., Media, for Com., appellant.
Arthur T. Donato, Jr., Media, for appellee.
David M. McGlaughlin, Philadelphia, for amicus curiae, Pennsylvania Ass'n of Defense Lawyers.
Before KELLY, POPOVICH and HOFFMAN, JJ.
POPOVICH, Judge:
The Fourth Amendment to the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. CONST. amend. IV.[1] Today, in light of this Constitutional mandate, we are asked to balance the individual's right to liberty against the societal need for police authority. In so doing, we must determine whether a Terry[2] frisk, which produced contraband, constituted a reasonable search and seizure within the perimeters of the above provision.
*604 The appellee in this case, Robert Marconi, filed a motion to suppress evidence that he claimed was illegally procured during a cursory pat-down for weapons. Before us is the Commonwealth's appeal from the final order entered in the Court of Common Pleas of Delaware County granting Marconi's motion. Following review, we affirm.
The trial court has provided us with its findings of fact. After an independent reading of the suppression hearing notes of testimony, we conclude that the trial court's statement is adequately supported by the record. Thus, we adopt its recitation for purposes of appeal. We have added citations to the record and elaborations, where necessary, in footnotes.
1. On August 18, 1989 at approximately 7:15 p.m., Sgt. Charles Palo of the Ridley Township Police Department was on patrol duty in plain clothes in an unmarked vehicle. [N.T., July 11, 1990, at 7]
2. Officer Palo has been a police officer for 12 years and is qualified as an expert in narcotics investigation. [Id. at 6-7]
3. While in the vicinity of the 600 block of South Avenue in Ridley Township, Sgt. Palo observed a 1982 Cadillac automobile pull into the parking lot of Our Lady of Lourdes Church and School which abuts South Avenue. [Id. at 8] The church and school were closed at that time. [Id.] Officer Palo then pulled his vehicle into a parking lot across the street from the subject Cadillac automobile and parked in an area approximately 75 to 100 feet away from the Cadillac automobile. [Id. at 9] There had been numerous previous acts of vandalism at the school and Sgt. Palo decided to observe the [...] Cadillac [...] so as to determine why [it] had parked in the school parking lot. [Id.] The weather was clear and there was daylight at the time. [Id.]
4. Sgt. Palo observed the driver of the subject vehicle, defendant Robert Marconi, exit from the driver's side of the [car] and begin to vomit. [Id. at 10] The defendant then walked to the passenger side of the vehicle where [a] female passenger exited[.] [She] entered the driver's side *605 of the vehicle while defendant entered the passenger side[.] [Id. at 11] After observing the subject vehicle for a period of three to five minutes, Sgt. Palo drove his vehicle to the subject vehicle to investigate. [Id. at 12] He wanted to determine the condition of each of the vehicle's occupants to discover if they were intoxicated. He also sought to determine why they were parked next to the school. [Id. at 13. See also id. at 24-25]
5. Sgt. Palo then parked near the subject vehicle, exited his vehicle and walked to the driver's window. He recognized the driver as the defendant's wife. [Id. at 16] Sgt. Palo had come into contact with the defendant and his wife in the past in responding to certain domestic disputes between them. [Id.] After identifying himself, Sgt. Palo observed the defendant as he appeared to conceal something in the rear of his pants; therefore, Sgt. Palo told the defendant to place his hands on the dashboard. [Id. at 15][3] Sgt. Palo was concerned for his safety as he knew that the defendant had been charged previously with drugs and weapons offenses. [Id. at 16-17][4]
6. Sgt. Palo advised the defendant to exit the vehicle whereupon he performed a frisk of the defendant to determine if he had any weapons on his person. [Id. at 17-18] Although he felt no weapon when patting the *606 rear pants pocket area, he felt an object in defendant's left rear pants pocket. [Id. at 18][5] He reached into that pocket and retrieved two plastic bags which appeared to contain controlled substances. The smaller of the bags (Commw.Exh. No. 2) appeared only to contain residue. The larger of the bags (Commw.Exh. No. 1) contained approximately 1.08 grams of controlled substances which, if felt during a pat down, would feel like a button or a wad of paper. [Id. at 18-19][6]
7. Sgt. Palo placed the defendant under arrest for alleged drug offenses and transported him to the police station. [Id. at 19] In searching the defendant at the police station, Sgt. Palo removed $324.00 from defendant's person. [Id. at 20] Sgt. Palo then provided defendant with the Miranda warnings whereupon defendant stated that he, in fact, did have methamphetamine, but possessed it for personal use and that he snorts it. [Id. at 20-22]
8. Sgt. Palo at no time noticed an odor of alcohol on defendant's person nor did defendant have any problem speaking. [Id. at 22-23][7]
Trial court opinion, at 1-4.
Based on the foregoing, the trial court was unable to find that Sgt. Palo had probable cause to believe that Marconi possessed evidence of crime which would justify an intrusion into his pants pocket at the time a frisk for weapons was conducted. Trial court opinion, at 5. We agree.
Before we discuss the Commonwealth's issue on appeal, we note that the Commonwealth certified in good faith that *607 the instant suppression order has substantially hampered the prosecution of this case.[8] In light of the certification, we may entertain this appeal. Commonwealth v. Dugger, 506 Pa. 537, 546-47, 486 A.2d 382, 386 (1985); see Commonwealth v. Rodriguez, 385 Pa.Super. 1, 2, 559 A.2d 947 (1989); Commonwealth v. Switzer, 375 Pa.Super. 137, 140, 543 A.2d 1216, 1218 (1988). See Commonwealth v. Defelice, 248 Pa.Super. 516, 522, 375 A.2d 360, 363 (1977).
Our scope and standard of review under the circumstances are established. Here, we may consider
only the evidence of the defendant's witnesses and so much of the Commonwealth evidence that, read in the context of the record as a whole, remains uncontradicted. Furthermore, our scope of appellate review is limited primarily to questions of law. We are bound by the suppression court's findings of fact if those findings are supported by the record. Factual findings wholly lacking in evidence, however, may be rejected.
Commonwealth v. Person, 385 Pa.Super. 197, 200, 560 A.2d 761, 762-63 (1989) (citations omitted); Commonwealth v. Stine, 372 Pa.Super. 312, 314, 539 A.2d 454, 455 (1988). See Commonwealth v. Cauto, 369 Pa.Super. 381, 393-94, 535 A.2d 602, 608-09 (1987) (this Court may reverse the suppression court only if its legal conclusions, drawn from the facts in the record, are erroneous). Cf. Commonwealth v. Fromal, 392 Pa.Super. 100, 111-12, 572 A.2d 711, 717 (1990).
On appeal, the Commonwealth raises one issue: whether probable cause to seize an object can arise where a police officer, during a frisk for weapons, feels what he believes (based on his training and experience) to be methamphetamine in the defendant's pocket. The Pennsylvania Association of Criminal Defense Lawyers, recognizing the importance of this issue, filed a brief of amicus curiae on behalf of Marconi. They phrased the statement of the *608 question involved as follows: "Should the Pennsylvania Courts recognize an exception to the probable cause/warrant requirements of the Fourth Amendment and Article I, § 8 based on the sense of touch and reputation of the person searched?" Amicus brief, at 4.[9] After a review of the record in this case, the parties' briefs and the applicable law, we conclude that the Sergeant's search exceeded the limits set forth by the United States Supreme Court in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and by the courts of this Commonwealth.[10] Accordingly, we affirm the trial court's order in this case.
In Terry, the Supreme Court defined the permissible scope of a "stop and frisk."[11] Eleven years later, the *609 Supreme Court cogently reiterated the principles underlying Terry in Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). There, the Supreme Court wrote:
[t]he Terry case created an exception to the requirement of probable cause, an exception whose `narrow scope' this Court `has been careful to maintain.' Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. [Citation omitted]. Nothing in Terry can be understood to allow a generalized *610 `cursory search for weapons' or, indeed, any search whatever for anything but weapons. The `narrow scope' of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place.
Id. at 93-94, 100 S.Ct. at 343 (emphasis added).
In Commonwealth v. Canning, 402 Pa.Super. 438, 587 A.2d 330 (1991) this Court found that an officer who arrested a man for public drunkenness exceeded the bounds of Terry when, during a frisk for weapons, the officer reached into the defendant's pocket and removed two small packets, one containing methamphetamine and the other containing marijuana. This Court held that the officer had no reason to believe that the two packets were weapons. In applying the Terry holding, this Court stated:
In Terry, the United States Supreme Court articulated a police officer's "narrowly drawn" authority to conduct a reasonable search for weapons for the officer's protection. Id. at 27, 88 S.Ct. at 1883. The officer may pat down or frisk a suspect for weapons only if he reasonably believes that criminal activity is afoot, and that the suspect may be armed and dangerous. Id. The officer must be able to articulate specific facts to justify his belief that the suspect may be armed and dangerous. Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). Moreover, the scope of a Terry search is limited. Because the "sole justification of the search ... is the protection of the police officer and others nearby,... it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, supra, 392 U.S. at 29, 88 S.Ct. at 1884. In the instant case, the officer exceeded the scope of a Terry search. In order to reach into a suspect's pockets during a Terry search, the officer would have to feel something that appears to be a *611 weapon. "Nothing in Terry can be understood to allow... any search whatever for anything but weapons." Ybarra v. Illinois, supra, 444 U.S. at 93-94, 100 S.Ct. at 343. Herein, Officer McCarthy, did not articulate any specific facts to justify a belief that appellant might be armed and dangerous nor did he confine his search to items that may have reasonably appeared to be weapons. As noted by the Municipal Court judge, the items retrieved from appellant's pocket, two small plastic bags, one containing a white powder and one containing a green weed, do "not feel like a gun, knife, or a blackjack or anything else." N.T., December 12, 1985, p. 12. Thus, the search cannot be justified under Terry.

Id., 402 Pa.Superior Ct. at 440-41, 587 A.2d at 331-32 (emphasis added).
Very clearly, the search in the instant case can not be justified under the Terry rationale or its progeny. See Commonwealth v. Luddy, 281 Pa.Super. 541, 422 A.2d 601 (1980). See Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (in conducting an investigatory detention of an individual in a motor vehicle, the officer may frisk the individual for weapons if the officer has formed a reasonable belief that the person is armed and dangerous) (emphasis added). See also Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (when the justification for conducting a search is the protection of the officer, s/he must be able to point to particular facts from which it may be inferred that the individual was armed and dangerous); Commonwealth v. Berrios, 437 Pa. 338, 340-341, 263 A.2d 342, 343 (1970) ("the arresting officer must be able `to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.' Good faith on the part of the officer, in itself, is not enough.") (citations omitted).
The Commonwealth asks us to accept or create a "plain touch" extension to the "plain view" rule, which in effect would yield yet another erosion to the Fourth Amendment warrant requirement. The Commonwealth argues that to adopt a "plain touch" doctrine would not be tantamount to *612 broadening the exceptions to the warrant requirement. Rather, the Commonwealth contends that "plain touch" is a form of "plain view" and that when a police officer feels what he believes to be a controlled substance based upon his experience, probable cause to conduct a search arises.
We begin our analysis by recognizing that warrantless searches are presumed unreasonable unless the search is justified by an exception to the warrant requirement. Commonwealth v. York, 381 Pa.Super. 55, 552 A.2d 1092 (1989). See Coolidge v. New Hampshire, 403 U.S. 443, 454, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564 (1971) ("[a]s a general rule a search or seizure without a warrant is deemed unreasonable for constitutional purposes."). In limited situations, the warrant requirement is excused. For example, see Carroll v. U.S., 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (discussing the automobile exception);[12]Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (search incident to a lawful arrest); New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) (same); Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (hot pursuit); U.S. v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (consent); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (exigent circumstances); Roaden v. Kentucky, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973) (same); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (evidence in plain view). Moreover, when an officer reasonably believes that criminal activity is afoot, he is authorized under Terry to conduct a protective search; i.e., a pat-down for weapons. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[13]
*613 Plainly, probable cause is a prerequisite to any search. Commonwealth v. Pinno, 433 Pa. 1, 248 A.2d 26 (1968). Thus, where less than probable cause exists, a cursory patdown for weapons may be all that is acceptable. Terry, supra. See also Alabama v. White, ___ U.S. ___, ___, 110 S.Ct. 2412, 2414-17, 110 L.Ed.2d 301, 308-09 (1990).
However, what begins as a lawful investigatory stop may escalate to an arrest if it is supported by probable cause. Commonwealth v. Elliott, 376 Pa.Super. 536, 551, 546 A.2d 654, 661 (1988). In Elliott, supra, this Court held that
[a]n officer may briefly detain a suspect and then proceed to conduct an actual search if the facts gleaned during that detention ripen into probable cause to arrest. Probable cause to arrest exists where the facts at the time of arrest would warrant a prudent person in believing that an offense had been committed, and that the suspect was the perpetrator of the offense.
Id. (citations omitted). See also Commonwealth v. Chamberlain, 332 Pa.Super. 108, 480 A.2d 1209 (1984) (accord); Commonwealth v. Palm, 315 Pa.Super. 377, 462 A.2d 243 (1983) (accord). Cf. Commonwealth v. Smith, 511 Pa. 36, 511 A.2d 796 (1986) (mere suspicions do not constitute probable cause to support a search warrant). See Commonwealth v. Rodriguez, 526 Pa. 268, 585 A.2d 988 (1991) (defines probable cause). See Commonwealth v. Klinedinst, 403 Pa.Super. 605, 589 A.2d 1119 (1991) (refers to Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and the "totality of the circumstances" test for probable cause).
We have applied these standards to the instant case. In so doing, we reach the same outcome as the trial court. Here, we find no evidence to support a conclusion that at the time of the pat-down, Sergeant Palo had probable cause to believe that Marconi's pants pocket contained drugs. Probable cause is the probability of criminal conduct,[14] not the possibility of criminal conduct.
*614 The facts show that Marconi was truly ill when he exited his automobile (N.T., July 11, 1990, at 22, 33), that he was with his family (id. at 29), that he was dressed casually (id. at 32), that he was not armed or dangerous (see N.T., July 11, 1990), that Sergeant Palo lacked reason to call for backup police aid or to draw his weapon (id. at 29), and that the items which Sergeant Palo confiscated could have been almost anything. In fact, when defense counsel asked, "You have no dispute that you didn't feel anything on his body that remotely felt like a weapon," Sergeant Palo replied, "That's correct." Id. at 32. See also id. at 33-34.
Despite the Commonwealth's assertions that "[t]hrough both specialized training and experience, Officer Palo knew how "rock" methamphetamine felt ...,"[15] we can not condone the formulation of probable cause based on mere speculation, conjecture or hindsight. Terry, supra. See Commonwealth v. Hunt, 280 Pa.Super. 205, 421 A.2d 684 (1980). Cf. Appellant's brief, at 11-13, 17-18, 20.
Moreover, all of the cases to which the Commonwealth refers deal with the "plain touch" of a container, not a person. We might be inclined to agree that when a police officer feels the shape of a gun concealed in a bag, probable cause to search is present. U.S. v. Russell, 655 F.2d 1261 (D.C.Cir.1981), vacated in part by U.S. v. Russell, 670 F.2d 323 (D.C.Cir.1982); U.S. v. Portillo, 633 F.2d 1313 (9th Cir.1980). However, we are not willing to use this rationale to justify a search of an individual where probable cause *615 can not exist.[16]
Here, the minute amount of drugs that was found on Marconi's person could not have been identified through the sense of touch. The object is as consistent in feeling with a button or an aspirin as it is with methamphetamine.[17] To *616 sanction a search under the facts of this case would be to allow police officers to assume that all small objects in one's pocket could be drugs.[18] This, we can not do. See Commonwealth v. Hunt, 280 Pa.Super. 205, 421 A.2d 684 (1980). Cf. Commonwealth v. Espada, 364 Pa.Super. 604, 528 A.2d 968 (1987); Commonwealth v. Jackson, 359 Pa.Super. 433, 519 A.2d 427 (1986).
We can not lose sight of the fact that this began as a Terry frisk. Once the officer was satisfied that Marconi was not armed and dangerous, the inquiry should have ended. Commonwealth v. Wasiuta, 280 Pa.Super. 256, 421 A.2d 710 (1980). See Commonwealth v. Carter, 334 Pa.Super. 369, 483 A.2d 495 (1984). Cf. Commonwealth v. Pine, 370 Pa.Super. 410, 536 A.2d 811 (1988). Cf. Commonwealth v. Williams, 287 Pa.Super. 19, 429 A.2d 698 (1981). *617 Accordingly, for the foregoing reasons, we affirm the trial court's order.
Order affirmed.
KELLY, J., files a concurring opinion.
KELLY, Judge, concurring.
I concur only in the result reached by the majority. The majority concludes "We can not lose sight of the fact that this began as a Terry frisk. Once the officer was satisfied that Marconi was not armed and dangerous, the inquiry should have ended." Majority Opinion at 18. To the extent that the majority finds that the instant circumstances presented sufficient justification for the officer to stop and conduct only a protective frisk, I agree.[1] To the extent, however, the majority holds that there can be no circumstances which would justify a police officer to conduct a further, more intrusive search based on tactile impressions, I must disagree.
It is axiomatic that the Fourth Amendment protects citizens from the government's unreasonable searches and seizures. Where, of course, the government lacks a search warrant, it is well settled that searches of the person are *618 considered reasonable if the officer had probable cause to believe the suspect was possessing contraband or was otherwise guilty of a crime. United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Commonwealth v. Canning, 402 Pa.Super. 438, 587 A.2d 330 (1991); Commonwealth v. Williams, 390 Pa.Super. 493, 568 A.2d 1281 (1990); Commonwealth v. Elliott, 376 Pa.Super. 536, 546 A.2d 654 (1988), appeal denied, 521 Pa. 617, 621, 557 A.2d 721, 724 (1989).
In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court considered the question of whether, in view of American criminals' "long tradition of armed violence," and the fact that "every year law enforcement officers are killed in the line of duty, and thousands more are wounded," Terry, supra, 392 U.S. at 23, 88 S.Ct. at 1881, 20 L.Ed.2d at 907, it is reasonable for an officer to conduct a protective search without probable cause. After balancing the citizen's interest in being free from unreasonable governmental intrusions against the officers' need for safety, the Court held that it is reasonable under the Fourth Amendment for the police officer to conduct a brief investigatory stop and weapons frisk where the officer has reasonable suspicion to believe that 1) criminal activity is afoot and 2) the person with whom he is dealing may be armed and dangerous. Terry, 392 U.S. at 31, 32, 88 S.Ct. at 1885, 20 L.Ed.2d at 911.
The majority concludes that a search following a protective frisk cannot be justified by the holding in Terry. Majority Opinion at 621. With this I agree. What the majority does not, in my opinion, make clear, is that the question involved instantly falls beyond the ambit of Terry's holding. Once it is established that the officer stopped and frisked the suspect only after he or she had reasonable suspicion that criminal activity was afoot and that the suspect was armed and dangerous, the requirements of *619 Terry are satisfied.[2] Whether or not an additional, more intrusive post-protective frisk search can be justified depends upon an entirely distinct inquiry: whether "further information came to light during the detention or the frisk to justify an arrest, which could have properly included a complete warrantless search." Commonwealth v. Carter, 334 Pa.Super. 369, 374, 483 A.2d 495, 497 (1984). This determination involves simply a question of whether there was sufficient evidence to establish that the officer had probable cause to arrest a suspect and search him or her *620 incident to the arrest. See United States v. Robinson, supra; Adams v. Williams, supra; Commonwealth v. Elliot, 376 Pa.Super. 536, 551, 546 A.2d 654, 661 (1988); Commonwealth v. Canning, supra, 402 Pa.Super. at 441, 587 A.2d at 332 ("[B]ecause there was probable cause to arrest, the officer was justified in searching appellant incident to that arrest and the evidence was properly admissible."). Neither Terry nor its progeny address this evidentiary concern.[3]
It is well established that visual evidence derived during an investigatory stop and frisk is considered relevant in making the probable cause determination. "The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with some criminal activity." Illinois v. Andreas, 463 U.S. 765, 711, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003, 1010 (1983); see also Horton v. California, 495 U.S. ___, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); Commonwealth v. Carelli, 377 Pa.Super. 117, 132-133, 546 A.2d 1185, 1192-93 (1988); Commonwealth v. Ferrari, 376 Pa.Super. 307, 326-327, 545 A.2d 1372, 1381-82 (1988). It has been applied in the context of protective weapons frisks to justify the seizure of evidence discovered when suspicious items were thought to be weapons, but discovered to be mere evidence of a crime when removed from a suspect's pocket. See Peters v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (consolidated on appeal with Sibron v. New York, *621 supra) (burglar's tools); Commonwealth v. Dial, 445 Pa. 251, 285 A.2d 125 (1971) (pill case and syringe); Commonwealth v. Elliot, 376 Pa.Super. 536, 546 A.2d 654 (1988) (stash kit). The plain view doctrine has also been applied to justify seizure of contraband discovered during a protective search of the passenger compartment of a suspect's car. See Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).
In Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), a plurality of the Supreme Court opined:
"Plain view" is perhaps better understood ... not as an independent "exception" to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer's "access to an object" may be.
The principle is grounded on the recognition that when a police officer has observed an object in "plain view," the owner's remaining interests in the object are merely those of possession and ownership. Likewise, it reflects the fact that requiring police to obtain a warrant once they have obtained a first-hand perception of contraband, stolen property, or incriminating evidence generally would be a "needless inconvenience" that might involve danger to the police and public. We have said previously that "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on ... Fourth Amendment interests against its promotion of legitimate governmental interests." In light of the private and governmental interests just outlined, our decisions have come to reflect the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately.

Id., 460 U.S. at 738-39, 103 S.Ct. at 1541-42, 75 L.Ed.2d at 511-12 (emphasis added) (citations omitted). The Court further explained that the terms "probable cause" and "immediately apparent" as used in plain view situations could not be interpreted as "establishing any requirement that a police officer `know' that certain items are contraband *622 or evidence of a crime." Id. 460 U.S. at 741, 103 S.Ct. at 1543, 75 L.Ed.2d at 513.
The Commonwealth argues that the tactile evidence derived through a frisk should be considered relevant in determining probable cause as well. I can find no reason to disagree.
The existence of both probable cause and reasonable suspicion are determined by considering all the facts and reasonably derivable inferences known to the officer at the time of the challenged act. See Commonwealth v. Gray, 509 Pa. 476, 503 A.2d 921 (1985) (adopting "totality of circumstances" test).[4] We do not apprehend facts or derive *623 inferences with our eyes, ears, nose, fingers, or tongue, nor by the senses connected with those parts of the body. Rather, as it has been previously explained, those parts and the senses connected with them merely serve as the conduits by which information is sent to the brain for processing:
... the sense organs provide us with a picture of the physical world. Our problem is to interpret the sensory information and extract its psychological content. To do this we need to process the incoming signals and interpret them on the basis of our past experiences. Memory plays an active role in this process. It provides the information about the past necessary for proper understanding of the present. There must be temporary storage facilities to maintain the incoming information while it is being interpreted, and it must be possible to add information about presently occurring events into permanent memory. We then make decisions and take actions on the information we have received.

Norman, Memory and Attention, at 3 (2d Ed.1796) (emphasis added).
Probable cause and reasonable suspicion are degrees of belief which express an assessment of the probability that a particular conclusion, drawn from the analysis of present sensory impressions and stored experiences, is correct. If the true concern is whether probable cause exists at the time of the challenged act, the type of the last sensory impression (i.e. visual, gustatory, olfactory, aural, or tactile) necessary to tip the balance and establish the requisite degree of belief, should not have constitutional significance.
Certainly, tactile impressions standing by themselves may often be wholly inadequate to support the requisite degree *624 of belief. The truth of this statement, however, in no way warrants a finding that such information is wholly irrelevant, as the tactile impression need not establish probable cause standing alone.[5]
Context, various contemporaneous sensory impressions, and the officer's memory and experience each may alter the probabilities significantly. See e.g. Texas v. Brown, supra (Powell, J., concurring) (officer may rely on training to make inferences and deductions); Commonwealth v. Stainbrook, 324 Pa.Super. 410, 471 A.2d 1223 (1984) (visual and olfactory impression combined with experience and training to establish probable cause); Commonwealth v. Trenge, 305 Pa.Super. 386, 451 A.2d 701 (1982) (same); Commonwealth v. Pullano, 295 Pa.Super. 68, 440 A.2d 1226 (1982) (olfactory and aural impressions combined with experience to establish probable cause); Commonwealth v. Veal, 287 Pa.Super. 113, 429 A.2d 1125 (1981) (context, visual impressions and experience combined to establish probable cause); Commonwealth v. Stoner, 236 Pa.Super. 161, 344 A.2d 633 (1975) (visual and olfactory impressions combined with experience to establish probable cause).
I find the reasoning utilized in two recent decisions particularly persuasive on this point. In United States v. Ceballos, 719 F.Supp. 119 (E.D.N.Y.1989), two well-experienced undercover Drug Enforcement Administration (DEA) agents conducted a surveillance over a New York City parking lot, specifically observing the customers using certain public pay phones. Id. at 121. The area was known to *625 be frequented by narcotics dealers who often used the pay phones "to transact their business." Id. Ceballos was observed dialing a telephone number, punching in an additional seven to ten digits, and hanging up without talking into the receiver. Id. Within less than one minute, he picked up the telephone which had begun to ring. Id. The DEA agents immediately recognized the procedure as the making of a "beeper call." Id. Ceballos then re-entered his car and, along with a co-defendant, drove a short distance only to stop and place two more telephone calls from another public pay phone. Id. Ceballos and his co-defendant then returned to the car and drove evasively and hurriedly. Id. All the while, the undercover agents successfully maintained surveillance. Id. Next, Ceballos and his co-defendant pulled over at a street corner, where Ceballos exited the car, opened the trunk, and removed two plastic grocery bags. Id. He gave one to the co-defendant, who "placed it inside his jacket." Id. The officers then made their move and confronted the suspects. Id. The co-defendant's attempt to flee was thwarted as a DEA agent was able to apprehend him and frisk him for weapons. Id. During the pat-down, one of the agents felt "a large bulge" inside the left side of the co-defendant's inside jacket pocket, which he knew from touching was not a gun or other weapon but rather which he "believed ... to be narcotics." Id. at 127.
After noting that the officer had reasonable suspicion to believe that the defendants were involved in drug dealing and that narcotics trafficking today reasonably warrants the conclusion that a suspected drug dealer may be armed and dangerous, the Ceballos Court held that the evidence derived in the post-frisk search was admissible:
The tactile discovery during the pat-down revealed evidence of the crime suspected and transformed the agent's reasonable suspicion into probable cause to arrest. The feel of the object, together with the pattern of defendants' behavior observed earlier, amounted to probable cause to believe the object was narcotics and that the defendants had committed a narcotics offense. The circumstances *626 preceding Agent Whipple's frisk of [co-defendant]  the "beeper calls," evasive driving, suspicious transaction and attempted flight  provided the foundation necessary for the natural ripening of suspicion into probable cause upon the incidental tactile discovery of cocaine during the pat-down for weapons. Any of the five senses, alone or in combination, may provide reliable evidence.

Id. at 128 (emphasis added).
Similarly, in United States v. Pace, 709 F.Supp. 948 (C.D.Cal.1989) aff'd 893 F.2d 1103 (9th Cir.1990), law enforcement agents (a Drug Enforcement Administration agent and a police officer) observed Pace, a suspected drug courier, walk furtively about the Los Angeles International Airport. Id. at 950. The agents approached Pace, identified themselves, and obtained his permission to search his bag and to pat-down his outer garments. Id. at 951. Although the search of the bag did not disclose narcotics or large sums of money, the pat-down did reveal that Pace was in fact a drug courier, for during the pat-down, the officer "felt two hard objects on [d]efendant's back. [The police officer] immediately identified these objects through the defendant's clothing as having the size and shape of two kilos of cocaine packaged in the form of `bricks.'" Id. Thereafter, the evidence was seized and defendant arrested. Id.
Pace moved for suppression of the two kilograms of cocaine. Id. at 950. After concluding that the frisk of the outer garments was justified through consent, the court reasoned that "[w]hen objects have a distinctive and consistent feel and shape that an officer has been trained to detect and has previous experience in detecting, then touching these objects provides the officer with the same recognition his sight would have produced." Id. at 955 (emphasis added). The court found credible the police officer's testimony that the true identity of the bricks was immediately identifiable by the well-trained police officer *627 who knew well the size, shape and hardness of cocaine packaged in brick form. Id.[6]
Of course, neither of these decisions are binding on this Court. Nor are the decisions of the several other jurisdictions which have already recognized that the touch of certain objects can be a relevant factor in determining probable cause. See United States v. Williams, 822 F.2d 1174 (D.C.Cir.1987) (collecting federal cases); State v. Richardson, 156 Wis.2d 128, 456 N.W.2d 830 (1990); Henderson v. State, 535 So.2d 659 (Fla.App.1988); People v. Lee, 194 Cal.App.3d 975, 240 Cal.Rptr. 32 (1987); State v. Washington, 134 Wis.2d 108, 396 N.W.2d 156 (1986); State v. Ortiz, 67 Haw. 181, 683 P.2d 822 (1984).[7] I would find, however, *628 the rationale employed in each is compelling and applicable in this jurisdiction.[8]
It is important to reaffirm that acceptance of the relevance of such tactile information in this context would not alter the suspect's protections against unreasonable searches and seizures. In each case, before the Commonwealth could justify the post-frisk search, the Commonwealth would still have the burden of establishing that the officer reasonably believed criminal activity was afoot and that the suspect frisked was armed and dangerous, and that the officer conducted a reasonable protective weapons frisk, during which tactile sensory impressions were received which, combined with other factors, provided probable cause to believe that contraband or evidence of a crime might be found on the suspect's person. The trial court would have the responsibility to make its own independent assessment of credibility and probability and would be free to reject claims that the frisk was warranted; that the frisk was reasonable in intensity and duration; that particular tactile sensations were obtained; and that the impressions combined with other facts gave rise to the required probable cause to believe that the item was contraband or evidence of a crime. Danger of police abuse would be greatly minimized by conscientious execution of the responsibility of the suppression judge to exercise independent *629 judgment in this respect, as the suppression court did instantly.
Moreover, recognition of the relevance of tactile impressions in determining probable cause would necessarily be no more and perhaps less susceptible to abuse by police disposed to make false claims, than are claims of visual, aural, or olfactory impressions. See United States v. Pace, supra, 709 F.Supp. at 956. An officer's claim to have seen the butt of a gun underneath a driver's seat,[9] to have smelled an odor of opium,[10] marijuana,[11] or alcohol,[12] or to have heard a suspect make a particular relevant statement[13] is necessarily personal, subjective and evanescent. Reviewing such claims, the suppression court is often effectively limited to an assessment of the officer's credibility. On the other hand, since tactile impressions involve physical objects which may be examined by and events that may be re-enacted before the suppression court, see United States v. Pace, supra, 709 F.Supp. at 956, they are readily subject to objective appraisal. Whatever the (in some cases) dubious reliability of the officer's claimed tactile impressions, the suppression court's unusually useful opportunity to scrutinize the officer's account precludes unfettered abuse of such testimony.
Succinctly, I cannot see how, in determining probable cause, the eyes can logically or reasonably say to the hands, "I have no need of thee." I would hold that, in such determinations, where the trial court credits the testimony of the officer as to the knowledge he or she derived from the touch of an object during a frisk, that knowledge, like *630 that derived from all other sensory impressions, must be given due consideration. Where probable cause is found to exist, a further, more intrusive frisk of the suspect's person is, of course, constitutionally reasonable.
Applying this rationale instantly, and granting due deference to the suppression court's determination, I am compelled to conclude that the officer lacked probable cause to search appellee after the investigatory stop and frisk. The officer testified that his frisk disclosed the tactile impression of an object which felt like a "rock or pebble." Although the officer testified that he believed this object to be drugs, the surrounding circumstances offered insufficient reason to believe that the object was contraband, or for that matter, that it was not simply just what it felt like: a "rock or pebble." Had the officer credibly testified that the crime he suspected appellee to have committed been a recent burglary of a nearby jewelry store, and had other surrounding circumstances lead the officer to believe that jewelry might have been carried out in the pockets of the culprit(s), the officer's testimony that he felt a "rock or pebble" in the pocket of appellee during a frisk might have warranted a finding of probable cause. See State v. Washington, 134 Wis.2d 108, 396 N.W.2d 156 (1986) (tactile impression of watches in pocket of suspect near recent burglary of jewelry store sufficient for probable cause). Since no such facts were established, I agree with the majority that the suppression court did not err herein. Hence, I concur.
NOTES
[1] Comparatively, Article I, Section 8 of the Pennsylvania Constitution reads:

That the general, great and essential principles of liberty and free government may be recognized and unalterably established, WE DECLARE that  ... Sec. 8. Security from searches and seizures. The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.
PA. CONST. art. I, § 8.
[2] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[3] On cross-examination, Sgt. Palo admitted that he never saw anything in Marconi's hand (N.T., July 11, 1990, at 26) and that when Marconi reached behind his back, "it looked like his hand was back by his back pocket. Whether it went in or not, I don't know." Id. at 27.
[4] The Sergeant testified as follows:

I know Mr. Marconi was convicted for manufacturing methamphetamine. I also knew that he was also arrested for having a cache of weapons in his home in Springfield. I also knew that he was an associate of Outlaw Motorcycle gangs, the Warlocks and the Pagans. And that he was involved with the Castle, that had lots of crime committed over in Nether Providence.
N.T., July 11, 1990, at 16. On cross-examination, Sgt. Palo said that no one had given him any information that Marconi was armed and dangerous on the day in question. See id. at 24, 31. Further, he stated that his knowledge of Marconi's reputation stemmed from what he had read in the newspaper "years ago" and from talking to police officers about Marconi "in the past." Id. at 31. See id. at 32.
[5] Regarding the frisk, Sgt. Palo stated that when he touched Marconi's back pocket, he "felt something there. It felt like a rock or a pebble." N.T., July 11, 1990, at 18. Sgt. Palo "then reached in and pulled out what was in that pocket." Id.
[6] Sgt. Palo testified that in his experience, when he has frisked individuals and felt "a hard type of object of this nature, ... when [he] retrieved it, [he] found it to be methamphetamine." N.T., July 11, 1990, at 19. He also stated, "Mr. Marconi's been arrested for the manufacture of methamphetamine. That gave me the belief that that was methamphetamine in his pocket." Id.
[7] Marconi also had no trouble walking. N.T., July 11, 1990, at 22.
[8] The seized physical evidence, to wit, the suppressed drugs, formed the basis of the charge against Marconi.
[9] See Commonwealth v. Brundidge, 404 Pa.Super. 106, 590 A.2d 302 (1991) (discusses the Fourth Amendment); see Commonwealth v. Edmunds, 526 Pa. 374, 388-89, 411-12, 586 A.2d 887, 894, 906 (1991) (discusses the Pennsylvania Constitution); Commonwealth v. Sell, 504 Pa. 46, 470 A.2d 457 (1983) (same).
[10] See In Interest of Dixon, 356 Pa.Super. 105, 514 A.2d 165 (1986). See also Commonwealth v. Edmunds, 526 Pa. 374, 586 A.2d 887 (1991).
[11] In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court explained the difference between a "stop" and an "arrest." It stated:

On the one hand, it is frequently argued that in dealing with the rapidly unfolding and often dangerous situations on city streets the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess. For this purpose it is urged that distinctions should be made between a "stop" and an "arrest" (or a "seizure" of a person), and between a "frisk" and a "search." Thus, it is argued, the police should be allowed to "stop" a person and detain him briefly for questioning upon suspicion that he may be connected with criminal activity. Upon suspicion that the person may be armed, the police should have the power to "frisk" him for weapons. If the "stop" and the "frisk" give rise to probable cause to believe that the suspect has committed a crime, then the police should be empowered to make a formal "arrest," and a full incident "search" of the person. This scheme is justified in part upon the notion that a "stop" and a "frisk" amount to a mere "minor inconvenience and petty indignity," which can properly be imposed upon the citizen in the interest of effective law enforcement on the basis of a police officer's suspicion.
Id. at 10-11, 88 S.Ct. at 1874 (footnotes omitted). Later, the Court stated:
But we deal here with an entire rubric of police conduct  necessarily swift action predicated upon the on-the-spot observations of the officer on the beat  which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures. Nonetheless, the notions which underlie both the warrant procedure and requirement of probable cause remain fully relevant in this context. In order to assess the reasonableness of Officer McFadden's conduct as a general proposition, it is necessary "first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interest of the private citizen," for there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." [Citation omitted]. And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. [....] And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? [Citations omitted].
Id. at 20-22, 88 S.Ct. at 1879-80 (footnotes omitted). See also id. at 23, 27, 88 S.Ct. at 1881, 1883. Finally, the Court concluded:
Each case of this sort will, of course, have to be decided on its own facts. We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.
Id. at 30-31, 88 S.Ct. at 1884.
[12] Cf. Commonwealth v. Trunzo, 404 Pa.Super. 15, 589 A.2d 1147 (1991).
[13] To determine whether a search or seizure is reasonable, we must balance the individual's right to be free from unwarranted governmental interference against society's interest in adequate and safe law enforcement. Commonwealth v. Davidson, 389 Pa.Super. 166, 171, 566 A.2d 897, 899 (1989); Commonwealth v. Hinkson, 315 Pa.Super. 23, 461 A.2d 616 (1983).
[14] Commonwealth v. Gray, 509 Pa. 476, 503 A.2d 921 (1985).
[15] Appellant's brief, at 18. The Commonwealth continued as follows:

[Sergeant Palo] had felt similar items in prior searches. Those items had proven to be "rock" methamphetamine. His training, experience, personal knowledge of the defendant, together with the defendant's behavior which indicated a desire to conceal something from the officer in the area of his body where the hard object was felt, all point to a finding of probable cause. Although near certainty of an object's incriminatory nature is not necessary, and there need only be a practical, nontechnical probability that incriminating evidence is involved [Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)], Officer Palo testified that upon feeling the rock-like object, he believed that it was contraband.
Id.
[16] As Marconi recognizes, it would be inconsistent with the purpose underlying Terry to apply "plain touch" in its purest form to individuals. Appellee's brief, at 10.
[17] The Commonwealth asks this Court to liken the sense of touch to the other senses. For the following reasons, we reject the Commonwealth's rationale.

"Seeing," "hearing," "smelling," and "tasting" are senses that are refined through an officer's experience. The police are taught to recognize certain sounds, smells and tastes during their training. Commonwealth v. Kendrick, 340 Pa.Super. 563, 571, 490 A.2d 923, 927 (1985) ("... it is important to focus on the circumstances as seen through the eyes of a trained officer and not to view the situation as an average citizen might.... [P]robable cause does not deal in certainties; rather, a court is faced with the factual and practical considerations of everyday life which affect how reasonable and prudent men act.") (citations omitted).
Conversely, when an individual feels an object through a pants pocket, and we now confine our analysis to the case at hand, the sense of touch is not so definitive. The structure and shape of a small packet is not unique so as to preclude other options as to what that item might be. In fact, the packet in this case has no discernible characteristics and does not reveal itself in a distinctive way.
We do not believe that it would be feasible to recognize a tactile equivalent to the plain view doctrine under the rationale advanced by the Commonwealth. Sights, sounds, smells and tastes are generally consistent to the senses. Here, the Commonwealth posits that probable cause arose when a police officer touched an object in the defendant's pants pocket and thought it to be contraband. During a cursory pat-down for weapons however, it would strain logic to conclude that a small packet could, with any sort of probability, be identified as an element of criminal activity.
As we stated in the body of this Opinion, we do not hold that under certain circumstances the sense of touch could not be used as an accurate technique of identity. At times, perception through touch is a tool as definitive as perception through the other senses. However, under the facts before us, we decline to extend the "plain view doctrine" to encompass "plain touch." Commonwealth v. Stoner, 236 Pa.Super. 161, 344 A.2d 633 (1975) (in discussing "plain smell" this Court recognized that an individual does not have a reasonable expectation of privacy in unlawful pursuits that are readily apparent by the use of ordinary senses). Cf. United States v. Williams, 822 F.2d 1174, 1182, 1184, 1185 (D.C.Cir.1987). See also Commonwealth v. Lovette, 498 Pa. 665, 450 A.2d 975 (1982).
We note also that in its traditional context, the plain view doctrine is associated with seizures, not searches. Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). See Commonwealth v. Milyak, 508 Pa. 2, 493 A.2d 1346 (1985); Commonwealth v. Ferrari, 376 Pa.Super. 307, 545 A.2d 1372 (1988); Commonwealth v. Weik, 360 Pa.Super. 560, 521 A.2d 44 (1987); Commonwealth v. Cihylik, 337 Pa.Super. 221, 486 A.2d 987 (1985).
[18] Here, we acknowledge the amicus curiae position that the Commonwealth seeks to permit searches of individuals based on an officer's knowledge of that individual's reputation. While reputation is a proper factor to be considered in formulating probable cause, it may not be used as the lone basis for that formulation. In short, reputation by itself may not establish probable cause for a search. U.S. v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

Due to our disposition of this case, we do not reach a conclusion as to whether the officer founded his suspicions solely on Marconi's reputation. Besides, to decide this issue based on the record certified to us would be to infringe on the trial court's function to weigh and assess witnesses' credibility.
Instead, here, we hold only that a prudent person could not have reasonably believed that an offense was being committed at the time of the stop. Thus, probable cause could not have arisen in this case. Commonwealth v. Elliott, 376 Pa.Super. 536, 546 A.2d 654 (1988).
[1] The trial court found as a matter of fact that the officer who conducted the instant frisk of appellee first "observed a 1982 Cadillac automobile pull into the parking lot," Trial Court Opinion at 1; see also N.T. July 11, 1990 at 8, and then "observed the driver of the subject vehicle [appellee] exit from the driver's side of the vehicle and begin to vomit." Trial Court Opinion at 2; see also N.T. July 11, 1990 at 10. The trial court found that the officer, suspecting that appellee might have been drinking and driving, approached, and when close enough to the car, recognized appellee, and "knew that the [appellee] had been charged previously with drugs and weapons offenses." Trial Court Opinion at 3; N.T. July 11, 1990 at 16-17. Review of the notes of testimony of the suppression hearing reveals that the officer also testified that upon recognizing appellee, he recalled that appellee had been involved in domestic violence, and that appellee had previously stored a case of grenades at his home. N.T. July 11, 1990 at 16, 17. The officer also testified that immediately before the frisk was conducted he observed appellee lean forward in his seat and reach into his back pocket. Id. at 15. Such facts unquestionably support the conclusion that the officer had a reasonable suspicion that appellee had committed a crime (e.g., driving while under the influence, 75 Pa.C.S.A. § 3731 (1991)), and that he was armed and dangerous.
[2] I disagree with the majority's conclusion that it would be "inconsistent with the purpose underlying Terry," Majority Opinion at 615, n. 16, to recognize the relevance of non-weapon tactile evidence gained during a Terry frisk. The Terry Court concluded that "The sole justification of the search in the present situation [stop and frisk] is the protection of the police officer and others nearby...." Id., 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 911. By excluding any evidence obtained where the police stopped and frisked without a reasonable fear the suspect was involved in criminal activity and possessing weapons, this purpose is served. Id.; see also Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Where, however, the officer frisks in accordance with Terry dictates and uncovers evidence of contraband other than weapons, no purpose announced in Terry is forwarded by excluding it at trial. See Michigan v. Long, 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201, 1220 (1983) (Where the officer "discover[s] contraband other than weapons, he clearly cannot ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances."); Sibron v. New York, 392 U.S. 40, 79, 88 S.Ct. 1889, 1910, 20 L.Ed.2d 917, 944 (1967) (Harlan, J., concurring) (If the frisk is lawful, "[t]he state is of course entitled to the use of any other contraband that appears."). If the opposite were true, then no non-weapon evidence which was discovered in plain view during an investigatory stop and protective search for weapons could be used at trial either. This we know to be false. See Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (during protective sweep of house, evidence in plain view was properly seized); Michigan v. Long, supra (seizure of evidence during protective sweep of car was reasonable); Commonwealth v. Henry, 358 Pa.Super. 306, 310, 517 A.2d 559, 561 (1986) (seizure of contraband, discovered by opening metal box as part of a self-protective Terry frisk, upheld as proper); Commonwealth v. Chamberlain, 332 Pa.Super. 108, 115-117, 480 A.2d 1209, 1213-14 (1984) (manilla envelopes, which are commonly used for drug packaging, were properly seized when they were observed in "plain view" during course of a protective Terry search); Commonwealth v. Nastari, 232 Pa.Super. 405, 411-412, 335 A.2d 468, 471-472 (1986) (bags appearing in "plain view" when police officer shined a flash light into defendant's vehicle as a protective measure were properly seized).
[3] In Commonwealth v. Canning, supra, the question before the Court was not whether, based on information derived during the frisk, the officer could further search the suspect; rather, the question before the Canning Court was whether the officer was justified in frisking the subject in the first place, since the officer "did not articulate any specific facts to justify a belief that appellant might be armed and dangerous." Canning, supra, 402 Pa.Superior Ct. at 441, 587 A.2d at 331. To the extent the Canning Court's decision may be seen to construe Terry to preclude the use of non-weapon evidence obtained in a search following a lawful stop and frisk, it must be considered obiter dicta.
[4] In Texas v. Brown, supra, the Court clarified:

As the Court frequently has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would `warrant a man of reasonable caution in the belief,' Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Moreover, our observation in United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), regarding "particularized suspicion," is equally applicable to the probable-cause requirement:
The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same  and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
Texas v. Brown, supra, 460 U.S. at 742, 103 S.Ct. at 1543, 75 L.Ed.2d at 514.
Justice Powell, with whom Justice Blackmun joined, concurred in the plurality decision in Brown. He wrote separately to note:
If probable cause must be shown, as the Payton dicta suggest, see Payton v. New York, 445 U.S. 573, 587, 100 S.Ct. 1371, [1380], 63 L.Ed.2d 639 (1980), I think it is clear that it existed here. Officer Maples testified that he previously had made an arrest in a case where narcotics were carried in tied-off balloons similar to the one at issue here. Other officers had told him of such cases. Even if it were not generally known that a balloon is a common container for carrying illegal narcotics, we have recognized that a law enforcement officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person. United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690 [695], 66 L.Ed.2d 621 (1981). We are not advised of any innocent item that is commonly carried in uninflated, tied-off balloons such as the one Officer Maples seized.
Brown v. Texas, supra, 460 U.S. at 746, 103 S.Ct. at 1545-46, 75 L.Ed.2d at 517.
[5] As one commentator has stated,

Assuming the object discovered in the pat-down does not feel like a weapon, this only means that a further search may not be justified under a Terry analysis. There remains the possibility that the feel of the object, together with other suspicious circumstances, will amount to probable cause that the object is contraband or some other items subject to seizure, in which case there may be a further search based upon that probable cause.
3 W. LaFave, Search and Seizure, sec. 9.4(c) at 524 (2d ed. 1987); see also I Works of James Wilson, 488-89 (1967) ("[t]he evidence of one sense may be corroborated, in some instances; and in some instance may be corrected, by that of another sense, when both senses convey information concerning the same object,. . . .").
[6] As the court in Ceballos, supra, recognized, "A virtuoso may draw reasonable inferences and suspicion of criminal involvement that would elude an amateur." Ceballos, supra, 719 F.Supp. at 124.
[7] I note that this Court has, in a different context, previously recognized analagous reasoning with regard to the sensory impressions necessary to give rise to an immediate sensory awareness of a tragic incident in determining whether a cognizable cause of action for negligent infliction of emotional distress has been pled. In Neff v. Lasso, 382 Pa.Super. 487, 555 A.2d 1304 (1989), this Court held:

Our analysis of the foregoing persuasive authorities convinces us that the "sensory and contemporaneous observance" requirement should not be limited to visual observance. Well reasoned opinions in this and other jurisdictions persuade us that the logical and practical focus of the second prong of the Dillon test should be whether the observance was direct and immediate as opposed to indirect and removed and not upon the particular sensory vehicle which gave rise to the awareness of the event and its personal import. It is the immediate sensory awareness and not the source (i.e. visual, tactile, aural, gustatory or olfactory), of the awareness which must control.
* * * * * *
It may be true that unlike visual observance, aural awareness may rarely, standing alone, give rise to a sufficient awareness of the nature and import of the event to cause severe emotional injury. However, aural perception (hearing the impact) when considered together with prior and subsequent visual observance (seeing Mr. Lasso's car speeding behind her husband's pickup and seeing her husband lying unconscious immediately after the impact), may produce a full, direct, and immediate awareness of the nature and import of the negligent conduct....
* * * * * *
Therefore, we conclude that "sensory and contemporaneous observance" is not limited to visual sensory perception but properly includes an aural sensory awareness as well. Succinctly, it is not the source of the awareness, rather, it is the degree of the awareness arising from all of the individual's senses and memory which must be determinative of whether the plaintiff's emotional shock resulted from a "sensory and contemporaneous observance" of the accident.
Id. 382 Pa.Super. at 505-06, 555 A.2d at 1313 (emphasis added).
[8] Although these cases deal only with the Fourth Amendment, exhaustive research has uncovered no relevant and material difference between the Fourth Amendment to the United States Constitution and Article I, section 8 of the Pennsylvania Constitution that would, in this context, lead me to conclude that the rationale used in each of these cases is in any way materially different from an application of Article I, section 8 to such facts. Compare Commonwealth v. Edmunds, 526 Pa. 374, 586 A.2d 887 (1991). Moreover, I note that neither party argues that a distinction between the constitutions in this context exists.
[9] See, e.g., New York v. Class, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986).
[10] See, e.g., Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).
[11] See, e.g., United States v. Johns, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985).
[12] See, e.g., Pennsylvania v. Muniz, ___ U.S. ___, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990).
[13] See, e.g., Cupp v. Murphy, 412 U.S. 291, 296, 93 S.Ct. 2000, 2004, 36 L.Ed.2d 900, 906 (1973).